UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                                    Plaintiff,                    09 Civ. 7594 (RJH)

            -against-
                                                         **MEMORANDUM OPINION
DOYLE SCOTT ELLIOTT, SCOTT ELLIOTT,                        AND ORDER**
INC., MICHAEL J. XIRINACHS, EMERALD
ASSET ADVISORS LLC, ROBERT L.
WEIDENBAUM, and CLX & ASSOCIATES INC.,

                                    Defendants.

Richard J. Holwell, District Judge:

        In this action, the Securities and Exchange Commission ("SEC") alleges that

defendants Doyle Scott Elliott, Scott Elliott, Inc. ("SEI"), Michael J. Xirinachs, Emerald

Asset Advisors LLC ("Emerald"), Robert L. Weidenbaum, and CLX & Associates Inc.

("CLX") (collectively, "Defendants") sold unregistered securities in violation of Section

5 of the Securities Act of 1933, 15 U.S.C. § 77e.  The SEC has moved for summary

judgment as to liability and several forms of relief:  a permanent injunction against

violating Section 5, disgorgement in an amount to include prejudgment interest, civil

penalties, and a penny stock bar.  For the reasons set forth below, the SEC's motion is

GRANTED in part and DENIED in part.

## BACKGROUND

### 1.  Universal Express

        The SEC alleges that Defendants sold unregistered securities of Universal

Express, Inc. ("Universal Express").  Universal Express was a Nevada corporation with

headquarters in Manhattan whose shares traded under the symbol USXP on the

automated quotation system maintained by the National Quotation Bureau, Inc., also known as the "Bulletin Board." (Pl.'s Xirinachs 56.1 Stat. ¶¶ 17, 20; Pl.'s Elliott 56.1 Stat. ¶ 14; Pl.'s Weidenbaum 56.1 Stat. ¶¶ 65, 68.)[1] Richard Altomare served as President and CEO of the company and Chris Gunderson served as its general counsel. (Pl.'s Xirinachs 56.1 Stat. ¶¶ 18-19; Pl.'s Elliott 56.1 Stat. ¶¶ 15-16; Pl.'s Weidenbaum 56.1 Stat. ¶¶ 66-67.) The company's shares traded for less than a penny. (Pl.'s Xirinachs 56.1 Stat. ¶ 28; Pl.'s Elliott 56.1 Stat. ¶ 81; Pl.'s Elliott 56.1 Stat. ¶ 14; Pl.'s Weidenbaum 56.1 Stat. ¶ 69.)

Universal Express purported to be in the shipping business (*see, e.g.*, Pl.'s Xirinachs 56.1 Stat. Ex. 100 at 48:10-19), but the SEC came to believe that the company was essentially a pump-and-dump scheme. On March 24, 2004, the SEC filed suit against Universal Express, Altomare, Gunderson, and others alleging that they made false statements about the company's business and sold millions of unregistered shares in violation of Section 5 of the Securities Act, *see SEC v. Universal Express, Inc.*, 04 Civ. 2322 (GEL). (Pl.'s Xirinachs 56.1 Stat. ¶ 39; Pl.'s Elliott 56.1 Stat. ¶ 78; Pl.'s Elliott 56.1 Stat. ¶ 14; Pl.'s Weidenbaum 56.1 Stat. ¶ 81.) After temporarily restraining Universal Express, Altomare, and Gunderson from violating Section 5 (among other provisions of the securities laws), Judge Lynch entered summary judgment for the SEC on its claim that the three defendants had violated Section 5 and permanently enjoined

---

[1] As used below, "Pl.'s Xirinachs 56.1 Stat." refers to the SEC's Statement of Material Facts in Support of Motion for Summ. J. Against Defs. Michael J. Xirinachs and Emerald Asset Advisors LLC, Feb. 4, 2011; "Pl.'s Elliott 56.1 Stat." refers to the SEC's Statement of Material Facts in Supp. of Summ. J. Against Defendants Doyle Scott Elliott and Scott Elliott, Inc., Feb. 4, 2011; and "Pl.'s Weidenbaum 56.1 Stat." refers to the SEC's Statement of Material Facts in Supp. of Summ. J. Against Defendants CLX & Associates, Inc., and Robert L. Weidenbaum, Feb. 4, 2011.

them from violating that provision, *see SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412 (S.D.N.Y. 2007).  (Pl.'s Xirinachs 56.1 Stat. ¶ 39; Pl.'s Elliott 56.1 Stat. ¶ 79; Pl.'s Weidenbaum 56.1 Stat. ¶ 81.)

Judge Lynch later appointed a receiver for the company who reported that the company was earning no income other than from sales of its securities and had incurred liabilities substantially in excess of its assets.  (Pl.'s Xirinachs 56.1 Stat. ¶ 40; Pl.'s Elliott 56.1 Stat. ¶¶ 79-80; Pl.'s Weidenbaum 56.1 Stat. ¶¶ 82-83.)  Universal Express was ultimately liquidated and ceased operations.  (Pl.'s Xirinachs 56.1 Stat. ¶ 40.5; Pl.'s Elliott 56.1 Stat. ¶ 80; Pl.'s Weidenbaum 56.1 Stat. ¶ 83.)

### 2.  Xirinachs and Emerald

The SEC alleges that Xirinachs sold unregistered Universal Express shares in brokerage accounts owned by two investment firms:  (a) defendant Emerald and (b) North Atlantic Resources Ltd. ("North Atlantic").

### a.  Emerald

Defendant Emerald, a Delaware limited liability company, is a hedge fund formed by defendant Xirinachs, its founder and sole member and an experienced investment advisor.  (Pl.'s Xirinachs 56.1 Stat. ¶¶ 7-16.)  On May 24, 2005, Xirinachs opened in the name of Emerald an account with the brokerage firm Basic Investors, Inc. ("Basic").  (*Id.* ¶ 41.)  Xirinachs completed the required forms, listed himself as "account executive" and "registered representative" with exclusive trading authority over the account, and represented that he was the sole proprietor of Emerald.  (Dec. of G. Purcell, Jan. 27, 2011 ("Purcell Dec.") ¶ 2; Pl.'s Xirinachs 56.1 Stat. ¶ 43.)

Gary Purcell served as the broker for the Emerald account with Basic. (*Id.* ¶ 45.) According to Purcell's sworn and undisputed testimony, either he or Basic broker Charles Barba spoke with Xirinachs almost every day regarding selling Universal Express shares. (Purcell Dec. ¶ 5.)

Xirinachs testified at his deposition that in 2006 Curt Kramer, a former colleague of Xirinachs's at another investment firm, told Xirinachs that Universal Express needed funding and that its stock was highly liquid. (Pl.'s Xirinachs 56.1 Stat. ¶ 48.) Kramer arranged for Altomare to call Xirinachs in February 2006. (*Id.* Ex. 100 at 47:7-11.) Altomare told Xirinachs that Universal Express needed funding to grow some of its divisions. (*Id.* Ex. 100 at 47:13-47:15, 48:10-22.) Xirinachs indicated that Emerald would invest $50,000 in Universal Express in exchange for the ability to purchase Universal Express shares at a discount. (*Id.* ¶ 49, Ex. 100 at 48:23-49:4.) In the ensuing weeks, Xirinachs confirmed these terms, Altomare sent Xirinachs wiring instructions, and Xirinachs wired $40,000 from an Emerald account to a Universal Express account. (*Id.* ¶¶ 50-51, 54-55.) Shortly thereafter, Emerald received 15 million shares of Universal Express stock from the company's transfer agent. (*Id.* ¶¶ 55, 58, 62.) One day later, Emerald sold these shares for a profit of $116,982.89. (*Id.* ¶ 64.)

Xirinachs does not dispute that he repeated this process again and again over the course of the next year. Specifically, the record shows that Xirinachs made 32 wire transfers for a total of $7,940,000 from the Emerald account to the Universal Express account; that Emerald received from the company's transfer agent certificates for a total of more than 6 billion shares of Universal Express stock; and that these shares were deposited in the Emerald brokerage account with Basic. (*Id.* ¶¶ 54, 56, 58-59.) Further,

the record shows that Emerald sold these shares—generally within a month—for total profits of nearly $10 million.  (*Id.* ¶¶ 64-85, 89.)

According to Purcell, Xirinachs placed the orders to sell the shares.  (Purcell Dec. ¶ 4.)  Prior to instructing Basic to make each sale of Universal Express shares, Xirinachs completed an IB Equity Authentication Form.  (Pl.'s Xirinachs 56.1 Stat. ¶ 99.)  That form indicated that "TO AVOID A SECTION 5 VIOLATION THE <u>EQUITY MU[ST]</u> <u>BE EITHER</u>: 1. Registered in an offering" or "2. Clearing under an exemption from registration."  (*Id.* Ex. 13.)  The form provided space to describe how and when the securities were registered and how the securities were exempt from registration.  (*Id.*)  Xirinachs did not complete this part of the form.  (*Id.*)

Xirinachs does not dispute that no registration statement was, in fact, in effect for Universal Express shares and that neither he nor Emerald filed one for the shares Emerald sold.  (Pl.'s Xirinachs 56.1 Stat. ¶¶ 91-93.)  Xirinachs, however, contends that "the record is replete with actions taken by [him] and Emerald to confirm that the shares were registered or covered by an exemption to the registration requirement."  (Xirinachs 56.1 Stat. ¶¶ 98-100.)  These actions include obtaining corporate resolutions from Universal Express stating that "the shares are free trading and will not be retracted at a later date"; receiving certificates that contained no restricted legends; receiving letters from the transfer agent that Xirinachs read to mean that the shares were free for trading; and speaking with Altomare and Gunderson who assured him that the company could issue registered shares pursuant to a bankruptcy order.  (*See* Dec. of D. Roque, Mar. 14, 2011 ("Roque Dec.") Exs. 3, 5, 7; Xirinachs 56.1 Stat. ¶¶ 98-99.)

### b. North Atlantic

North Atlantic is an investment company incorporated under the laws of St. Vincent and the Grenadines.  (Pl.'s Xirinachs 56.1 Stat. ¶ 101.)  The company's principal is Thomas G. Phillips.  (*Id.*)  On September 26, 2006, Phillips opened in North Atlantic's name a brokerage account with Basic.  (*Id.* ¶ 102.)  Purcell also served as the broker for the North Atlantic account.  (*Id.* ¶ 106.)  On the account forms, Phillips listed Xirinachs as an investment advisor for North Atlantic with authority to direct Basic to make trades in the brokerage account. (*Id.* ¶¶ 103-104.)   Xirinachs, however, testified that, vis-à-vis North Atlantic, he did not have the authority without consulting with Phillips to direct Basic to make trades in North Atlantic's account.  (Xirinachs 56.1 Stat. ¶¶ 103-104.)

Xirinachs testified that he recommended Universal Express to North Atlantic. (Pl.'s Xirinachs 56.1 Stat. Ex. 100, 70:16-20.)  He further testified that, as with Emerald, he arranged for North Atlantic to purchase Universal Express shares at a discount. (*Id.* ¶ 109.)  Between September 2006 and June 2007, North Atlantic wired $3 million from its account to a Universal Express account.  (*Id.* ¶ 130.)  At Altomare's direction, Universal Express issued and its transfer agent delivered 9.5 billion shares to North Atlantic.  (*Id.* ¶¶ 110-129, 131.)  North Atlantic deposited the shares into its brokerage account at Basic (*id.* ¶ 132) and North Atlantic sold the shares—usually within a month—for profits of over $3.4 million (*id.* ¶¶ 133-144, 148-49, 158).

Purcell avers that Xirinachs, his "main contact," instructed Basic to make these sales.  (Purcell Dec. ¶ 7.)  Purcell acknowledges that Phillips was listed as a contact on the account but only recalls speaking with him on one occasion.  (*Id.*)  Purcell did not aver that any other Basic broker serviced the North Atlantic account.

6

Xirinachs does not dispute that no registration statement was in effect for Universal Express shares and that neither he nor North Atlantic filed one for the shares North Atlantic sold.  (Pl.'s Xirinachs 56.1 Stat. ¶¶ 152-54.)  Emerald is not alleged to have been liable for these trades.

### 3.  Weidenbaum and CLX

Defendant CLX is a Florida corporation owned by defendant Weidenbaum, its President, sole officer, and sole proprietor and an experienced securities broker.  (Pl.'s Weidenbaum 56.1 Stat. ¶¶ 14-15, 17.)

On September 21, 2004, CLX, by Weidenbaum, entered into an agreement with Universal Express whereby CLX would provide consulting services to Universal Express in exchange for 1 million shares per month.  (*Id.* Ex. 207.)  The agreement did not require CLX to pay anything for the shares and did not require Universal Express to file a registration statement before issuing the shares to CLX.

Pursuant to the agreement, between September 2004 and June 2007, Universal Express directed its transfer agents to issue to CLX 35 certificates for a total of 932 million shares.  (*Id.* ¶¶ 24, 29.)  These shares were deposited in brokerage accounts in the name of CLX which, according to the documentary record, Weidenbaum opened and with respect to which he had trading authority.  (*Id.* ¶¶ 26, 32, 33, 35, 37, 39.)  CLX sold these shares for net profits of $2,411,397.40.  (*Id.* ¶¶ 34, 36, 38, 40-42, 44.)  CLX generally sold the shares within weeks after they were issued.  (*Id.* ¶ 43.)

Weidenbaum asserted his Fifth Amendment privilege in response to questions regarding whether he controlled CLX's brokerage accounts and whether he directed the deposits into and sales out of CLX's brokerage accounts.  (*Id.* ¶¶ 52-56.)

Weidenbaum also purchased over 3.3 million shares for his own account for $170,000. (*Id.* ¶¶ 46-48.) Universal Express issued these shares on January 25, 2005. (*Id.* ¶ 47.) In March 2006, Weidenbaum sent documents to a brokerage firm proposing to sell these shares pursuant to Securities and Exchange Commission Rule 144, 17 C.F.R. § 230.144, which in some circumstances provides a so-called "safe harbor" for unregistered securities that have been held for more than one year. (*Id.* Ex. 212.) The SEC does not allege that Weidenbaum violated Section 5 with respect to these shares.

It is undisputed that there was no registration statement in effect for the Universal Express shares that CLX sold. (*Id.* ¶ 45.) However, Weidenbaum also asserted his Fifth Amendment privilege regarding his knowledge of the registration requirements, including the operation of Rule 104, and of the SEC's proceedings against Universal Express, Altomare, and Gunderson. (*Id.* ¶¶ 58-59, 61, 63-64.)

### 4. Elliott and SEI

Defendant SEI is a Florida corporation owned by defendant Elliott, its President and an experienced securities broker. (Pl.'s Elliott 56.1 Stat. ¶¶ 6-7, 11-12.) Elliott testified that he was introduced to Altomare during a visit to Boca Raton, Florida in late 2003. (*Id.* Ex. 12, 27:17-25.) Elliott met with Altomare at Altomare's office where the two men discussed Universal Express. (*Id.* Ex. 12 at 28:19-23.) Shortly thereafter, Universal Express hired Elliott as a consultant. (*Id.* at 28:24-26.)

In early 2004, the parties committed this arrangement to writing. A draft consulting agreement provided that Elliott would be compensated in the form of options to purchase shares that "will be prior to delivery . . . registered pursuant to valid and effective registration statements." (*Id.* Ex. 19 at 2.) However, on January 29, 2004,

8

Elliott signed a version of the agreement that provided that he would be compensated in the form of 200,000 Universal Express shares per month but did not provide that the shares would be properly registered.  (*Id.* Ex. 20 at 2.)  On February 4, 2004, Elliott executed an amendment to the consulting agreement providing that he could accept options to purchase 10 million shares per month at a discount in lieu of receiving 200,000 shares per month.  (*Id.* Ex. 21 at 2.)

The next month, the SEC filed its action against Universal Express, Altomare, and Gunderson.  On March 25, Elliott faxed Gunderson a letter indicating that he intended to return two stock certificates and stating that "given the magnitude of the allegations USXP faces, we at Elliott & Associates, respectfully and regrettably wish to suspend our consulting contract with USXP for an indefinite period of time."  (*Id.* ¶ 26; Ex. 22.)  However, Elliott testified that he did not know what he was referring to in the letter (*id.* Ex. 20 at 44:12-24) and he does not appear to have followed through on his declaration.

Not only did Elliott sign two more amendments to the consulting agreement increasing the number of shares he would receive each month from 200,000 to 1.5 million.  (*Id.* ¶¶ 27-28.)  Between February 2004 and August 2007, Elliott wired more than $8 million from his account to a Universal Express account in what Elliott testified was an exercise of his option to purchase shares at a discount.  (*Id.* ¶¶ 57-59.)  Between February 2004 and March 2007, Universal Express issued to Elliott, SEI, or clearing firms for brokerage firms where Elliott or SEI had accounts some 207 certificates for a total of over 5 billion shares.  (*Id.* ¶ 42).  (Elliott exercised exclusive control over his and SEI's brokerage accounts. (*See id.* ¶ 41.))  The process worked as follows:  Elliott would inform Altomare that he intended to purchase shares at a discount, would wire funds to

Universal Express, and would receive share certificates from Gunderson.  (*Id.* ¶ 43; Ex. 12, 36:16-37:19.)  Elliott and SEI later sold over 4 billion of those shares for proceeds of over $14.3 million and profits of over $6.2 million.  (*Id.* ¶ 61.)   On average, Elliott and SEI sold the shares less than two weeks after they were issued.  (*Id.* ¶¶ 64-65.)

It is undisputed that no registration statement was filed for the shares that Elliott and SEI sold and that neither Elliott nor SEI filed any such statement.  (*Id.* ¶¶ 72-74.)

### 5.  Procedural History

The SEC filed its complaint in this action on September 1, 2009.  Xirinachs and Emerald answered the complaint on September 24, 2009.  After a series of extensions, Weidenbaum and CLX answered the complaint on January 6, 2010.   Elliott and SEI have not yet answered the complaint and are not represented by counsel.  Following a post-discovery telephone conference on December 16, 2010, the Court directed Elliott and SEI to answer or otherwise respond to the complaint by January 21, 2011.  Elliott and SEI have still not done so and have not filed any response to the instant motion.

On February 4, 2011, the SEC moved [71] for summary judgment against all defendants.   During briefing on the motion, the SEC, Weidenbaum, and CLX pursued settlement discussions.  Those efforts produced an agreement whereby Weidenbaum and CLX consented to entry of an order permanently enjoining them from violating Section 5, imposing a penny stock bar, and assessing disgorgement, including prejudgment interest, and civil penalties in amounts to be determined.  On March 18, 2011, the SEC moved [95] for entry of a consent order to that effect.

## LEGAL STANDARD

Summary judgment is proper if the moving party shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The same standard applies where the non-moving party does not oppose the motion for summary judgment. *See Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001) ("[E]ven when a nonmoving party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial."). *Cf.* Fed. R. Civ. P. 56(e) ("If the adverse party does not so respond, summary judgment, *if appropriate,* shall be entered against the adverse party.") (emphasis added). "In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (internal quotation marks omitted).

A party opposing summary judgment "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ. Proc. 56(e). "Summary judgment in favor of the party with the burden of persuasion, however, is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie,* 526 U.S. 541, 553

(1999).  As the plaintiff, the SEC bears the burden of persuasion with regard to

defendants' alleged violations of Section 5 and to show grounds for the relief requested.

## DISCUSSION

### A.  Liability

#### 1.    Section 5

As relevant here, Section 5 of the Securities Act of 1933 provides that "[u]nless a

registration statement is in effect as to a security, it shall be unlawful for any person,

directly or indirectly—

> (1) to make use of any means or instruments of transportation or communication
> in interstate commerce or of the mails to sell such security through the use or
> medium of any prospectus or otherwise; or
>
> (2) to carry or cause to be carried through the mails or in interstate commerce, by
> any means or instruments of transportation, any such security for the purpose of
> sale or for delivery after sale.

15 U.S.C. § 77e(a).  In short, "Section 5 requires that securities be registered with the

SEC before any person may sell or offer to sell such securities."  *SEC v. Cavanaugh*, 445

F.3d 105, 111 (2d Cir. 2006).

"To prove a violation of Section 5 requires establishing three prima facie

elements: (1) That the defendant directly or indirectly sold or offered to sell securities; (2)

that no registration statement was in effect for the subject securities; and (3) that

interstate means were used in connection with the offer or sale."  *SEC v. Universal*

*Express, Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007) (Lynch, J.).  Scienter is

conspicuous by its absence from these elements.  Indeed, "[s]cienter is not an element of

a section 5 violation."  *SEC v. Czarnik*, No. 10 Civ. 745, 2010 WL 4860678, at * 11

(S.D.N.Y. Nov. 29, 2010); *see also SEC v. Ramoil Mgmt., Ltd.*, No. 01 Civ. 9057, 2007

WL 3146943, at *10 (S.D.N.Y. Oct. 25, 2007) ("The Commission does not need to prove

scienter to prove a violation of Section 5."); *Universal Express, Inc.*, 475 F. Supp. 2d at

422. "A defendant may rebut a prima facie case by showing that the securities involved

were not required to be registered." *Id.* (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119,

126 (1953)); *see also Cavanaugh*, 445 F.3d at 111 n.13.

 With respect to the first element—the sale of securities—the defendants "do not

have to be involved in the final step of the distribution to have participated in it."

*Zacharias v. SEC*, 569 F.3d 458, 464 (D.C. Cir. 2009) (quotation marks omitted).

Rather, "[t]o demonstrate that a defendant sold securities, the SEC must prove that the

defendant was a 'necessary participant' or 'substantial factor' in the illicit sale." *SEC v.*

*Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004); *see also SEC v. Phan*, 500 F.3d 895, 906

(9th Cir. 2007) (citing *SEC v. Murphy*, 626 F.2d 633, 648, 652 (9th Cir. 1980)); *SEC v.*

*Holschuh*, 694 F.2d 130, 139 (7th Cir. 1982) ("Defendants have been held liable where

they have been a 'necessary participant' and "substantial factor" in the offer and sale of

unregistered securities."); *Ramoil Mgmt., Ltd.*, 2007 WL 3146943, at *10; *Universal*

*Express*, 475 F. Supp. 2d at 422; *SEC v. Cavanaugh,* 1 F. Supp. 2d 337, 372 (S.D.N.Y.),

*aff'd,* 155 F.3d 129 (2d. Cir. 1998).

 The "necessary participant test . . .  essentially asks whether, but for the

defendant's participation, the sale transaction would not have taken place." *Murphy*, 626

F.2d at 651 (quotation marks omitted).  As for substantial participation, to be sure it "is a

concept without precise bounds," but "one who plans a scheme, or, at the least, is a

substantial motivating factor behind it, will be held liable as a seller." *SEC v. Rogers*,

790 F.2d 1450, 1456 (9th Cir. 1986), *overruled on other grounds by Pinter v. Dahl,* 486

U.S. 622 (1988).  "[I]n practice," however, the "necessary participant" and "substantial

factor" "standards differ little, for no court using the 'necessary participant' test has found liable a defendant whose acts were not a substantial factor in the sales transaction." *Murphy*, 626 F.2d at 652.

### 2.   Xirinachs and Emerald

#### a.   Emerald Trades

Xirinachs and Emerald concede liability on the trades made by Emerald.  (*See* Xirinachs Opp'n at 1.).  Accordingly, summary judgment on liability is warranted as to those trades.

#### b.   North Atlantic Trades

The trades made by North Atlantic stand on a different footing.  Xirinachs does not contest that no registration statement was in effect for the Universal Express securities that North Atlantic traded.  Nor does Xirinachs contest that these trades were made via interstate means.  Rather, Xirinachs argues that there are material issues of fact as to whether he was a "substantial factor" in the North Atlantic trades.  (*See id.*) Specifically, Xirinachs "disputes that he directed all of the sales of North Atlantic's Universal Express shares and that Mr. Purcell acted as the only broker for the North Atlantic account."  (*Id.* at 5.)

Xirinachs points to two pieces of evidence on that point.  First, pointing to an affidavit sworn to by Purcell, Xirinachs argues that "at least one other individual, Charles Barba," acted as a broker for North Atlantic's account and "therefore other brokers may have taken sale orders from individuals other than Mr. Xirinachs."  (*Id.*)   That is not what Purcell averred.  Rather, Purcell's affidavit states that "[e]ither Charles Barba, another trader at Basic Investors, or I spoke with Mr. Xirinachs by telephone almost

every day, if he had any trades to do in the *Emerald Advisors' Account*" and that Xirinachs "directed Mr. Barba or me to sell the shares at a certain level without hurting the stock price."  (Purcell Dec. ¶ 5 (emphasis added).)  Purcell nowhere avers that Barba or anyone else worked alongside him as a broker on the North Atlantic account.  Accordingly, there is nothing in the record to support Xirinachs's speculation that "other brokers may have taken sale orders from individuals other than Mr. Xirinachs."

Second, Xirinachs argues that "Purcell, who executed Universal Express sales, acknowledges that he spoke with Thomas Phillips of North Atlantic and does not deny taking sale orders from Mr. Phillips."  (Xirinachs Opp'n at 5.)  Xirinachs places more weight on Purcell's affidavit than it can bear.  It is hardly probative that Purcell does not deny taking sale orders in a document that does not purport to be a response to a question as to whether he did.  And Xirinachs never deposed Purcell to ask him that very question.  Nor did Xirinachs depose Phillips.

Purcell's acknowledgement that he spoke with Phillips does no more to create a genuine issue of material fact.  What Purcell averred was that "[a]lthough Thomas Phillips who was located in Gibraltar was listed as a contact on the account, I do not recall speaking with him other than on one occasion."  (Purcell Dec. ¶ 7.)  Purcell further averred, however, that Xirinachs was his "main contact" for the North Atlantic account; that "Xirinachs had full trading authorization over the North Atlantic account"; that he "spoke with Mr. Xirinachs by telephone when he placed orders to sell stock from the North Atlantic account"; and that "Xirinachs placed the orders to sell Universal Express

shares out of the North Atlantic Account." (*Id.*) [2]  Indeed, Purcell refers to a set of documents on which Phillips granted Xirinachs trading authorization over the account. (*See* SEC Xirinachs 56.1 Stat. Ex. 18.)   Furthermore, the SEC advances undisputed evidence that Xirinachs negotiated an agreement with Universal Express whereby North Atlantic could purchase Universal Express shares at a discount and contracted with North Atlantic to receive ten percent of proceeds from trading in those shares.  (*See* SEC Xirinachs 56.1 Stat. ¶¶ 109, 150.)  *Cf. Calvo*, 378 F.3d at 1215 (defendant illegally sold unregistered securities of [a company] in brokerage account of a firm called Diversified where, *inter alia*, he "negotiated and signed the contract with [the company] pursuant to which Diversified received the unregistered shares" and "received proceeds . . . through Diversified . . . from the sale of [the company's] shares").

It is useful to compare this body of evidence to the evidence the SEC marshaled to support allegations that other investment managers had violated Section 5 by trading in unregistered Universal Express shares.

One of those managers, Sandhu, allegedly traded shares on behalf of two companies, Spiga and the Target Growth Fund.  "The SEC submit[ted] undisputed evidence that Sandhu negotiated the consulting agreement between Universal Express and Spiga pursuant to which shares were issued"; "that he held trading authority over some of Spiga's brokerage accounts and instructed one brokerage firm at some point about the price at which to sell Universal Express shares; that he advised Spiga about the amount, price, and timing of Universal Express stock sales; and that he advised trades in

---

[2] Hence this is hardly a case where "witnesses could not recall specific attempts by [the defendant] to sell the investments or to promote the . . . scheme." *Rogers*, 790 F.2d at 1457 (district court's conclusion that defendant was not liable for sales of unregistered securities was not clearly erroneous).

a brokerage account of Target Growth Fund. . . ."  *Universal Express, Inc.*, 475 F. Supp. 2d at 435.  While the court stated that "[t]hese facts strongly impl[ied] that Sandhu played a substantial role in Spiga's sales," the court also cited evidence that a Spiga director named Dakin "received significant communications from a major Spiga brokerage account" which Sandhu allegedly controlled "and that Dakin signed off on authorizations to transfer funds to Universal Express from the account."  *Id.*  The court also noted that the SEC did not contend that Sandhu had trading authority over the Target Growth Fund's brokerage account.  *See id.*  In those circumstances, the court denied summary judgment as to Sandhu's liability.  *See id.*

This case is different.  The most Xirinachs can show is that Purcell had one conversation with Phillips, a North Atlantic executive.  That single conversation hardly amounts to "significant communications."  Nor is there evidence that Phillips or anyone else ever sent orders to trade unregistered Universal Express shares in the North Atlantic brokerage account.  And the undisputed evidence shows that Xirinachs had trading authority over the account.

These facts make this case more like that of Tarun Menditatta, another trader defendant in *Universal Express, Inc.*  There, the SEC alleged that Mendiratta traded unregistered Universal Express shares in brokerage accounts of his aunts, Dhingra and Kaila.  The SEC marshaled evidence that "that Mendiratta repeatedly instructed Dhingra's and Kaila's main brokerage firm when to make sizeable sales of unregistered Universal Express stock from their accounts, and that no one else communicated with the broker about these trades."  *Id.* at 437.  Where "Mendiratta submit[ted] nothing to dispute that only he was actively involved in trading Universal Express stock from Dhingra's and

Kaila's accounts," the court found no genuine issue of material fact as to whether the SEC had established a *prima facie* case. *Id.* at 438.[3]

It is just so here. Xirinachs does not dispute Purcell's sworn allegations that "he was actively involved in trading Universal Express stock from [North Atlantic's] accounts," but instead posits that he was not the only one. However, the single conversation that Purcell had with Phillips is not meaningfully different from a set of facts where "no one else communicated with the broker about these trades."[4] Thus Xirinachs has not raised a genuine issue of material fact as to whether he was a "substantial factor" in North Atlantic's sales of unregistered Universal Express shares. Since Xirinachs does not contest the other elements of his liability under Section 5, the SEC is entitled to summary judgment as to Xirinachs's liability for sales of shares in North Atlantic's brokerage account.

### 3. Weidenbaum and CLX

Weidenbaum and CLX have consented to entry of an order permanently enjoining them from violating Section 5, imposing a penny stock bar, and finding them liable for disgorgement, including prejudgment interest, and civil penalties. In connection with that

---

[3] The court nevertheless denied the SEC's motion for summary judgment against Mendiratta because a genuine issue of material fact existed regarding whether the Securities Act exempted the securities at issue from registration. *See Universal Express, Inc.*, 475 F. Supp. 2d at 438-39.

[4] In his Rule 56.1 Statement, Xirinachs points to his own testimony that he could not sell Universal Express shares in the North Atlantic account without prior approval from Phillips. (*See* Xirinachs 56.1 Stat. ¶¶ 103, 104, 107, 145.) To the extent that Xirinachs attempts to defeat summary judgment on the basis of that evidence, the argument is unpersuasive because "it need not be shown that a defendant exercised control over a trading account to establish that he 'engaged in steps necessary to the distribution of [unregistered] security issues.'" *Universal Express, Inc.*, 475 F. Supp. 2d at 437 (quoting *SEC v. Chinese Consol. Benev. Ass'n, Inc.,* 120 F.2d 738, 741 (2d Cir. 1941)).

consent order, both Weidenbaum and CLX waived their right to findings of fact and
conclusions of law pursuant to Federal Rule of Civil Procedure 52.   Accordingly, the
issue of their liability is not before the Court.

### 4.   Elliott and SEI

Neither Elliott nor SEI has answered the complaint or opposed the SEC's
summary judgment motion.  While the Court must nevertheless assess whether the SEC
has shown that there is no genuine issue of material fact as to Elliott's and SEI's liability,
*see Amaker*, 274 F.3d at 681, the Court is satisfied that there is none.  In his investigative
testimony, Elliott admitted that he sold Universal Express shares via his own and SEI's
brokerage account and there is no evidence that a registration statement for those shares
was in effect at the time that Elliott and SEI sold them.  Accordingly, the SEC is entitled
to summary judgment as to Elliott's and SEI's liability.

### B.  Remedies

"Once the district court has found federal securities law violations, it has broad
equitable power to fashion appropriate remedies, including ordering that culpable
defendants disgorge their profits."  *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1474
(2d Cir. 1996).  "Under the express terms of [Section 20]," the remedial section of the
Securities Act, "a controlling person who has failed to establish his good-faith defense is
to be held 'liable jointly and severally with and to the same extent as' the controlled
person."  *Id.* at 1475 (quoting 15 U.S.C. § 78t).  *Cf.* 15 U.S.C. § 77t(a) (same under the
Securities Act).  "Accordingly, where a firm has received gains through its unlawful
conduct, [and] where its owner and chief executive officer has collaborated in that
conduct and has profited from the violations . . .  it is within the discretion of the court to

determine that the owner-officer too should be subject, on a joint and several basis, to the [remedial] order." *First Jersey Secs., Inc.*, 101 F.3d at 1475.

## 1.    Governing Law

### a.    Permanent Injunction

Section 20 provides that, where a violation of the Securities Act has been shown, "upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond."  15 U.S.C. § 77t(b).  The "proper showing" requires the SEC to show that "there is a likelihood that, unless enjoined, the violations will continue." *CFTC v. Am. Bd. of Trade, Inc.,* 803 F.2d 1242, 1250-51 (2d Cir. 1986); *see also SEC v. Haligiannis*, 470 F. Supp. 2d 373, 383 (S.D.N.Y. 2007) ("A permanent injunction is appropriate where there has been a violation of the federal securities laws and there is a reasonable likelihood of future violations.").  "Because this remedy is derived from statute, there is no requirement that the SEC demonstrate irreparable harm as there generally is for permanent injunctions."  *Id.* at 383 n.9.  Rather, district courts consider "(1) the egregiousness of the violation; (2) the degree of scienter; (3) the isolated or repeated nature of the violations; and (4) the sincerity of defendant's assurances against future violations." *Id.;* see *also SEC v. Universal Major Ind. Corp.*, 546 F.2d 1044, 1048 (2d Cir. 1976).

"Where, as here, "defendants are active in the securities field '[a]n injunction is a drastic remedy, not a mild prophylactic . . . .'" *SEC v. Am. Bd. of Trade, Inc.*, 751 F.2d 529, 535-36 (2d Cir. 1984) (quoting *Aaron v. SEC,* 446 U.S. 680, 703 (1980) (Burger, C.J., concurring)).  However, "an injunction is particularly within the court's discretion where a violation was founded on systematic wrongdoing, rather than an isolated

occurrence, and where the court views the defendant's degree of culpability and continued protestations of innocence as indications that injunctive relief is warranted, since 'persistent refusals to admit any wrongdoing ma[k]e it rather dubious that [the offenders] are likely to avoid such violations of the securities laws in the future in the absence of an injunction.'" *First Jersey Secs., Inc.*, 101 F.3d at 1477 (quoting *SEC v. Lorin,* 76 F.3d 458, 461 (2d Cir. 1996) (per curiam)) (other quotation marks omitted).

### b.      Disgorgement

"In the exercise of its equity powers, a district court may order the disgorgement of profits acquired through securities fraud." *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995). "The primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws." *First Jersey Secs., Inc.*, 101 F.3d at 1474. "The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *Id.* at 1474-75.

"In determining the amount of disgorgement to be ordered, a court must focus on the extent to which a defendant has profited from his fraud." *SEC v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 563 (S.D.N.Y. 2009). Hence the amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation." *Patel,* 61 F.3d at 139. "Once the SEC has satisfied its burden to demonstrate such an approximation, 'the burden shifts to the defendant to demonstrat[e] that he received less than the full amount allegedly misappropriated and sought to be disgorged.'" *Universal Express, Inc.*, 646 F. Supp. 2d at 563 (quoting *SEC v. Rosenfeld,* No. 97 Civ. 1467, 2001 WL 118612, at *2 (S.D.N.Y. Jan. 9, 2001)). That is because the "risk of uncertainty . . .

should fall on the wrongdoer whose illegal conduct created that uncertainty." *Lorin,* 76

F.3d at 462 (ellipsis in original) (quotation marks omitted).

### c.        Prejudgment Interest

"In addition to its discretion to order disgorgement, a court has the discretion to

award prejudgment interest on the amount of disgorgement and to determine the rate at

which such interest should be calculated." *Universal Express, Inc.*, 646 F. Supp. 2d at

566.  This remedy, "like the remedy of disgorgement itself, is meant to deprive

wrongdoers of the fruits of their ill-gotten gains from violating securities laws." *SEC v.*

*Lorin,* 877 F. Supp. 192, 201 (S.D.N.Y.1995), *aff'd in part and vacated in part, Lorin,*

*supra*, 76 F.3d 458.  "Prejudgment interest is generally calculated at the rate used by the

Internal Revenue Service for interest on underpaid taxes under 26 U.S.C. § 6621(a)(2)

because '[t]hat rate reflects what it would have cost to borrow the money from the

government and therefore reasonably approximates one of the benefits the defendant

derived from its fraud.'" *SEC v. Aimsi Technologies, Inc.*, 650 F. Supp. 2d 296, 304

(S.D.N.Y. 2009) (quoting *First Jersey Secs.,* 101 F.3d at 1476)).

"'A decision to award prejudgment interest 'should be a function of (i) the need to

fully compensate the wronged party for actual damages suffered, (ii) considerations of

fairness and the relative equities of the award, (iii) the remedial purpose of the statute

involved, and/or (iv) such other general principles as are deemed relevant by the court.'"

*Commercial Union Assur. Co., plc v. Milken*, 17 F.3d 608, 613 (2d Cir. 1994) (quoting

*Wickham Contracting Co. v. Local Union No. 3,* 955 F.2d 831, 833-34 (2d Cir.), *cert.*

*denied,* 506 U.S. 946 (1992)).  "In an enforcement action brought by a regulatory agency,

the remedial purpose of the statute takes on special importance." *First Jersey Secs., Inc.*, 101 F.3d at 1476.

Some defendants also suggest that "courts also look to whether the defendant's conduct was 'willful' or in 'bad faith.'" (Weidenbaum Opp'n at 5.)  It is true that the First Circuit has held that "[a]mong the factors to be considered in weighing the equities" is "the willfulness of the insider's violation," *Riseman v. Orion Research, Inc.,* 749 F.2d 915, 921 (1st Cir. 1984), and that "[i]n the context of Section 10(b) and Rule 10b-5 actions, proof of *scienter* is sufficient to justify an award of prejudgment interest." *SEC v. Sekhri,* No. 98 CV 2320, 2002 WL 31100823, at *18 (S.D.N.Y. July 22, 2002). However, the Court is not aware of any authority in this Circuit either for the proposition that scienter is necessary to justify an award of prejudgment interest in an enforcement action or for the proposition that it is necessary for a Court to consider scienter before awarding prejudgment interest in such an action.

Nor would either proposition make sense.  Both disgorgement and prejudgment interest are "meant to deprive wrongdoers of the fruits of their ill-gotten gains from violating securities laws." *Lorin,* 877 F. Supp. at 201.  Indeed, in some sense, an award of prejudgment interest merely serves to make the disgorgement remedy completely effective by "ensur[ing] that the defendant does not profit from obtaining the time-value of any unlawful profits earned from the date of the fraud to the date judgment is entered." *SEC v. World Info. Tech., Inc.*, 590 F. Supp. 2d 574, 578 (S.D.N.Y. 2008).  Put another way, "[r]equiring payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity." *Haligiannis*, 470 F. Supp. 2d at 385.  As such, disgorgement and prejudgment interest

flow from the principle that, as between one who has broken the law and the authorities charged with enforcing it, the lawbreaker should not be able to retain the fruits of the violation.  That is no less true where the defendant has violated a law that does not require knowledge of wrongdoing.

Accordingly, while scienter may be relevant to "considerations of fairness and the relative equities of the award" broadly understood, *Milken*, 17 F.3d at 613, in the absence of any authority requiring a court to consider scienter in exercising equitable authority to award prejudgment interest, the Court concludes that issues of fact regarding scienter do not inevitably preclude an otherwise justified order of disgorgement and prejudgment interest.

### d.      Civil Penalties

Section 20 of the Securities Act also provides that "the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation."  15 U.S.C. § 77t(d)(1).  "Such penalties are designed to deter future violations of the securities laws and thereby further the goals of 'encouraging investor confidence, increasing the efficiency of financial markets, and promoting the stability of the securities industry.'"   *Universal Express, Inc.*, 646 F. Supp. 2d at 567 (quoting *SEC v. Palmisano,* 135 F.3d 860, 866 (2d Cir. 1998)).

Section 20 provides for three tiers of civil penalties.  In the first tier, "[t]he amount of the penalty shall be determined by the court in light of the facts and circumstances."  15 U.S.C. § 77t(d)(2)(A).  In the second tier, the court can award up to "$50,000 for a natural person or $250,000 for any other person" or "the gross amount of pecuniary gain to such defendant as a result of the violation, if the violation . . . involved

24

fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."  15 U.S.C. § 77t(d)(2)(B).  In the third tier, the court can award up to "$100,000 for a natural person or $500,000 for any other person" or "the gross amount of pecuniary gain to such defendant as a result of the violation, if the violation . . . involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."  15 U.S.C. § 77t(d)(2)(C).

"The courts look to the same factors in imposing civil penalties as in the issuance of a permanent injunction."  *SEC v. Credit Bancorp, Ltd.*, 738 F. Supp. 2d 376, 391 (S.D.N.Y. 2010).  Hence "[i]n determining whether civil penalties should be imposed, and the amount of the fine, courts look to a number of factors, including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition."  *Haligiannis*, 470 F. Supp. 2d at 386; *see also Credit Bancorp, Ltd.*, 738 F. Supp. 2d at 391; *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007).  "[T]he civil penalty framework is of a 'discretionary nature' and each case 'has its own particular facts and circumstances which determine the appropriate penalty to be imposed.'"  *Id.* (quoting *SEC v. Moran,* 944 F. Supp. 286, 296-97 (S.D.N.Y. 1996)).

### e.     Penny Stock Bar

Section 20 of the Securities Act provides that in a proceeding alleging a violation of the Act by a "person participating in, or, at the time of the alleged misconduct, who

was participating in, an offering of penny stock, the court may prohibit that person from participating in an offering of penny stock, conditionally or unconditionally, and permanently or for such period of time as the court shall determine." 15 U.S.C. § 77t(g)(1).

"The standard for imposing [a penny-stock] bar essentially mirrors that for imposing an officer-or-director bar." *Universal Express, Inc.*, 475 F. Supp. 2d at 429; *see also SEC v. Becker*, No. 09 Civ. 5707, 2010 WL 2710613, at *1 (S.D.N.Y. July 8, 2010). "The Second Circuit has considered the following factors when considering the imposition of an officer-and-director bar: '(1) the "egregiousness" of the underlying securities law violation; (2) the defendant's "repeat offender" status; (3) the defendant's "role" or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur.'" *Id.* (quoting *Patel*, 61 F.3d at 141). Accordingly, courts have considered those factors in determining whether to impose a penny stock bar. *See SEC v. Jadidian*, No. 08 Civ. 8079, 2011 WL 1327245, at *7 (S.D.N.Y. Mar. 31, 2011); *Becker*, 2010 WL 2710613, at *1.

### 2. Application

#### a. Xirinachs and Emerald

The foregoing shows that whether to enter a permanent injunction, order a penny stock bar, or impose civil penalties are inquiries that turn on very similar sets of considerations. With respect to Xirinachs and Emerald, most of those factors point to granting the relief that the SEC has requested. Xirinachs and Emerald do not dispute they sold billions of Universal Express shares through numerous sales of millions of shares

26

over a one year period.   Hence the undisputed evidences show that they were "repeat offender[s]" whose "egregious" conduct was "recurrent" rather than "isolated."   *See Becker*, 2010 WL 2710613, at *1; *Haligiannis*, 470 F. Supp. 2d at 383, 386.   That casts doubt on their assurances that there is little "likelihood that misconduct will recur." *Becker*, 2010 WL 2710613, at *1.  What is more, Xirinachs and Emerald do not point to any evidence challenging the SEC's showing that they profited from their unregistered sales while other investors suffered losses when Universal Express shares became diluted and ultimately worthless.  While Xirinachs disputes that he profited from North Atlantic's sales (*see* Xirinachs Opp'n at 6), he submits no evidence in the form of bank accounts or otherwise to support that blanket denial.

The key point of contention between the parties is scienter.  "As the SEC itself points out, its requests for various forms of injunctive relief and civil penalties . . . all require the Court to consider, to some extent, the defendant's scienter."   *Universal Express, Inc.*, 475 F. Supp. 2d at 434.  Xirinachs and Emerald point to several pieces of evidence which they argue show that they "lacked scienter, acted in good faith, and were deceived into believing that the shares were unrestricted."  (Xirinachs Opp'n at 10.) These include a corporate resolution faxed from Universal Express's general counsel bearing the company's corporate seal, signed by the board of directors, and issuing shares to Emerald that are "free and trading" (Ex. 3); share certificates that contain no restrictive legend (Exs. 5); and Xirinachs's own testimony that he and Emerald relied on these documents in concluding that the shares were registered.  Xirinachs and Emerald argue that this evidence creates a genuine issue of material fact as to their scienter.

The SEC counters that "[c]ourts have regularly granted summary judgment in the face of contested scienter issues" and argues that "Xirinachs'[s] knowledge of the federal securities laws from his years of experience as a broker and investment advisor to hedge funds, and his failure to request that Universal Express file an effective registration statement demonstrate his scienter or recklessness. . . ."  (SEC Xirinachs Reply at 7-8.) The Court shares the SEC's skepticism as to whether an experienced investor like Xirinachs really relied in good faith on informal assurances, the absence of a restricted legend, and a single line in a company resolution.  Skepticism is particularly warranted where Xirinachs appears to have declined to answer questions on brokerage forms about whether the securities in question were registered or, if not, why they were exempt.  (*See* Ex. 13.)  That comes close to an admission of at least willful blindness.  However, on the present record, which does not include evidence regarding the custom and practice in the securities industry regarding how investment managers verify whether securities are registered, the Court cannot conclude that there is no question of fact as to whether Xirinachs acted in good faith in light of his experience.   In those circumstances, summary judgment is normally inappropriate.

Of course, this is not a normal case because defendants have no right to a jury trial with respect to whether to impose the relief the SEC has requested.  *See Tull v. United States*, 481 U.S. 412, 427 (1987) ("We therefore hold that a determination of a civil penalty is not an essential function of a jury trial, and that the Seventh Amendment does not require a jury trial for that purpose in a civil action."); *SEC v. Tome*, 833 F.2d 1086, 1096 n.7 (2d Cir. 1987) ("[T]he Seventh Amendment right to a jury trial does not apply to the equitable actions for disgorgement."); *SEC v. Commonwealth Chem. Secs.,*

*Inc.,* 574 F.2d 90, 95 (2d Cir. 1978) (same re: action for disgorgement and injunction).

Rather, those questions are within the Court's equitable discretion based on a series of

factors.  Moreover, whereas scienter is in some cases a required element of a claim that

either exists or does not exist, the remedial issues here turn only in part on the "degree of

scienter."  *Haligiannis*, 470 F. Supp. 2d at 383 (permanent injunction); *id.* at 386 (civil

penalties).  In those circumstances, if what evidence of scienter that does exist, coupled

with the other factors, justifies an injunction and civil penalties, it might have been

justified to order that relief without an evidentiary hearing.

On the other hand, however, the Ninth Circuit has held that such a decision is

error.  *See SEC v. M & A West, Inc.*, 538 F.3d 1043 (9th Cir. 2008).  In *M & A West*, the

defendant pointed to "his own testimony" as well as "legal opinions, upon which he

claim[ed] he relied, to support his argument that he acted in good faith."  *Id.* at 1054.  The

district court rejected that explanation and, applying standards nearly identical to those

set forth above, ordered a second-tier penalty.  The Ninth Circuit held that while "the

district court did not find [this] evidence persuasive, this evidence does create a material

issue of fact as to [the defendant's] state of mind during the transactions. . . ."  *Id.*  Since

"such an assessment may only be made after a fully evidentiary hearing," the Ninth

Circuit vacated the second-tier civil penalties and the injunction.  *Id.* at 1055.  *See also*

*SEC v. Novus Technologies, LLC*, No. 2:07–CV–235–TC, 2010 WL 4180550, at *13 (D.

Utah Oct. 20, 2010) ("Because the court finds that Mr. Thompson's state of mind is a

question of fact . . .  that may not be resolved based on the evidence before the court, the

court declines to impose such a penalty at this time.").

The Court finds the Ninth Circuit's reasoning in *M & A West* persuasive. Accordingly, the Court will deny the SEC's motion for summary judgment insofar as it requests a permanent injunction, a penny stock bar, or civil penalties.

It remains to determine whether to order disgorgement and prejudgment interest at this time. The Court is aware that Judge Lynch has stated that "the decision to order any particular amount of disgorgement is best made on the fullest possible understanding of the scope of wrongdoing," and declined to order disgorgement where genuine issues regarding scienter existed. *Universal Express, Inc.*, 475 F. Supp. 2d at 434. However, Judge Lynch also acknowledged that it "it might not be error to order the requested amount of disgorgement on the Section 5 violation," *Universal Express, Inc.*, 475 F. Supp. 2d at 434, and the Court shares that view.

"Disgorgement is not dependent on scienter, but is tied instead to the idea of unjust enrichment:  the broad idea is that persons not profit from breaking the securities laws." *SEC v. Merchant Capital, LLC*, 397 Fed.Appx. 593, 595 (11th Cir. 2010). Where defendants have been found liable for violating the securities laws, it would seem strange to forbear from imposing a remedy whose purpose "to deprive violators of their ill-gotten gains," *First Jersey Secs., Inc.*, 101 F.3d at 1474, merely because the defendants did not know their gains were wrongful. That logic is consistent with the dearth of authority instructing courts to consider scienter in determining whether and to what extent to order disgorgement as well as the Ninth Circuit's decision in *M & A West* to affirm an order of disgorgement and prejudgment interest despite the existence of a genuine issue regarding the defendant's scienter. *See M & A West*, 538 F.3d at 1054; *see also SEC v. Merchant*

*Capital, LLC*, 311 Fed.Appx. 250, 252 (11th Cir. 2009) (ordering disgorgement while remanding for consideration of permanent injunction in light of scienter issue).

In the end, however, the Court has already concluded that it will hold an evidentiary hearing regarding scienter to the extent it is relevant to the SEC's requests for injunctive relief and civil penalties.  In that case, there is little to be gained by ordering disgorgement and prejudgment interest prior to such a hearing.

Accordingly, the Court will grant in part and deny in part the SEC's motion for summary judgment insofar as it requests disgorgement and prejudgment interest.  The motion is not granted in full because, to the extent that the Court finds evidence adduced at the evidentiary hearing relevant to the exercise of its equitable authority to award disgorgement or prejudgment interest, the Court will consider such evidence in determining the amount of disgorgement and prejudgment interest.  However, the motion is granted in part because Xirinachs and Emerald have not raised any genuine issue as to the reasonableness of the SEC's estimate of their illicit gains or the SEC's calculation of prejudgment interest thereon.  Accordingly, the import, if any, of the evidentiary hearing to disgorgement and prejudgment interest shall be limited to whether to disgorge the full amount of Xirinachs and Emerald's gains and prejudgment interest in the amounts that the SEC has reasonably estimated for purposes of the instant motion.[5]

---

[5] The SEC has reasonably estimated Xirinachs's and Emerald's profits on Emerald's trades at $3,052,752 and calculated prejudgment interest thereon in the amount of $591,719.77.  The SEC has reasonably estimated Xirinachs's profits on North Atlantic's trades at $345,462 and calculated prejudgment interest thereon in the amount of $66,961.45.

### b.      Weidenbaum and CLX

Weidenbaum and CLX have consented to entry of an order permanently enjoining them from violating Section 5 and finding them liable for disgorgement, prejudgment interest, and civil penalties in amounts to be determined.   The Court is in receipt of a proposed order to that effect and will enter that order in substance as set forth below. Hence the only remedial issues before the Court are the amount, if any, of disgorgement, prejudgment interest, and civil penalties.

With respect to disgorgement, the SEC estimates Weidenbaum and CLX's profits at $2,411,397.20.  Weidenbaum and CLX do not contest the reasonableness of this amount.  Rather, they contest that they should have to pay it now.  Specifically, they argue that their "financial resources are limited" and that "Weidenbaum also faces financial sanctions in two parallel securities-related actions," one criminal and one civil, in the Southern District of Florida:  *United States v. Weidenbaum*, 1:11-CR-20131 (JEM) (S.D. Fla.), and *SEC v. Curshen, et al.*, 1:10-CV-20561 (JLK) (S.D. Fla.)  (Weidenbaum Opp'n at 3-4.)  However, those actions allege "a pump-and-dump scheme that occurred between late 2006 and April 2007" involving "CO2 Tech Ltd." and are not in any way related to this action.  (*Id.* at 3.)

In support of their argument about deferring any disgorgement award, Weidenbaum and CLX cite *SEC v. Credit Bancorp., Ltd.*, No. 99 Civ. 11395, 2011 WL 666158, at *1 (S.D.N.Y. Feb. 14, 2011).  However, the import of that citation is mysterious because the court in *Credit Bancorp* stated that "'[f]inancial hardship does not preclude the imposition of an order of disgorgement,' and Defendant's current financial net-worth is irrelevant to the Court's consideration of the disgorgement award." *Id.*

(quoting *SEC v. One Wall Street, Inc.,* No. 06 Civ. 4217, 2008 WL 63256, at *3
(E.D.N.Y. Jan. 3, 2008)).  What is more, as the SEC points out, even if financial hardship
were relevant, Weidenbaum and CLX have done nothing to show it.  Finally, where
neither the SEC nor the Department of Justice has asked the court to defer any
disgorgement award, Weidenbaum and CLX's argument that the Court should conserve
resources for other actions brought by those agencies is unpersuasive.  Since
disgorgement is warranted, the SEC has advanced a reasonable amount, and the Court is
not persuaded that there should be any delay in paying it, the Court will grant summary
judgment to the SEC with respect to its request for an order directing Weidenbaum and
CLX to disgorge $2,411,397.20.  Weidenbaum and CLX shall be jointly and severally
liable for such disgorgement.

As set forth above, whether to award prejudgment interest or impose civil
penalties turns on multiple factors, most of them undisputed.  Weidenbaum and CLX do
not contest that they sold hundreds of millions of Universal Express shares for a profit of
$2.4 million after Universal Express had been enjoined from offering or selling
unregistered shares.  Hence their conduct was "egregious" in any reasonable sense of the
term and indisputably "recurrent" rather than "isolated."  *Haligiannis*, 470 F. Supp. 2d at
386.  Nor do Weidenbaum and CLX dispute the SEC's contention that their sales of
unregistered shares "created substantial losses or the risk of substantial losses to other
persons," *id.*, because their actions contributed to the devaluation of shares held by other
investors.  (*See* SEC Br. at 43-44.)

Instead, Weidenbaum and CLX argue that "the SEC has failed to show that [they]
acted 'willfully' or with 'bad faith.'"  (Weidenbaum Opp'n at 5.)  For the reasons set

forth above, the Court has already concluded that the law in this Circuit does not require

a court to consider a defendant's scienter in deciding whether to award prejudgment

interest.  Yet even assuming that scienter is relevant to prejudgment interest, as it is to

civil penalties, Weidenbaum and CLX do not point to any evidence that creates a material

issue of fact as to scienter.

　　　　Weidenbaum and CLX argue that evidence that he held some 3 million shares that

he personally acquired supports his good faith belief that those shares were properly

registered as they do an attempt to evade registration requirement.  That argument strains

credulity.  In theory it is possible that Weidenbaum, believing that the shares were

properly registered, merely decided to hold those shares.  However, that seems quite

unlikely given the undisputed evidence that Weidenbaum almost invariably and

repeatedly sold Universal Express shares within weeks of acquiring them.  In that case,

evidence that Weidenbaum did not do the same with his own shares suggests that he

believed that the only way he could trade those shares was by waiting for the requisite

"safe harbor" period pursuant to Rule 144.  *Cf.* 17 C.F.R. 230.144(d)(ii) (exempting sales

by "any person who is not an affiliate of the issuer at the time of the sale . . . who sells

restricted securities of the issuer for his or her own account" where one year has elapsed

between the acquisition of securities from the issuer and their resale).[6]

　　　　There is another reason why it is unreasonable to infer good faith from

Weidenbaum's holding of his own shares.  In response to questions by the SEC regarding

---

[6] Of course, if that is so, it is passing strange that Weidenbaum was risk averse as to his
own shares in a company in whose shares he brazenly traded for others.  But
Weidenbaum would not be the first violator of the securities laws who was more careful
about his own investments.  Nor, if no explanation suffices, would he be the first violator
whose actions were simply inexplicable.  It is sufficient to note that Weidenbaum's own
innocent explanation is far from convincing.

whether he had produced all relevant documents and what he knew about Universal

Express shares, Rule 144, and the registration requirements of the Securities Act,

Weidenbaum invoked the Fifth Amendment privilege against self-incrimination.  (*See*

SEC Weidenbaum 56.1 Stat. ¶¶ 7, 59-61, 62-64.)  In those circumstances, the Court can

and will draw an inference that Weidenbaum does not believe his own argument

regarding Rule 144.  *See SEC v. Brennan*, 230 F.3d 65, 77 (2d Cir. 2000) (defendant's

refusal "to answer questions regarding his control over and access to the trust's funds . . .

. in a civil proceeding permits the inference that he did control the trust"); *see also*

*Universal Express, Inc.*, 475 F. Supp. 2d at 438 n.20.[7]  While such an inference might

not be necessarily conclusive, *see id.*, Weidenbaum and CLX do not point to any other

evidence creating a material issue of fact regarding scienter.  That distinguishes this case

from *M&A West* where the defendant submitted his own testimony and a legal opinion in

support of his claim that he relied on Rule 144 in good faith.  *See* 538 F.3d at 1054.

     Thus to the extent that scienter is a factor in whether and to what extent to award

prejudgment interest or impose civil penalties, there is no genuine issue as to whether that

factor weights in favor of Weidenbaum and CLX.  It does not.  Nor do the other relevant

factors.  Accordingly, the Court will grant summary judgment to the SEC with respect to

its request for an order directing Weidenbaum and CLX to pay prejudgment interest in

the amount of $486,344,40.  Weidenbaum and CLX shall be jointly and severally liable

for such interest.

---

[7] Weidenbaum also invoked the privilege in response to general questions about whether
he made certain trades of Universal Express shares.  (*See* SEC Weidenbaum 56.1 Stat.
¶¶51-58.)  Since such trades could not be criminal unless Weidenbaum knew that he was
making them in unregistered securities, these answers, too, give rise to an inference that
Weidenbaum acted with scienter.

For the same reasons, Court will grant summary judgment to the SEC with respect to its request for an order imposing civil penalties on Weidenbaum and CLX.  While it is true that "whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition" is a factor in determining the amount of any civil penalty, *Haligiannis*, 470 F. Supp. 2d at 386, Weidenbaum and CLX have not provided any documentation regarding their financial conditions.  In that case, the Court has no reason to reduce the award on that ground.  Accordingly, the Court will impose a civil penalty in the amount of $2,411,397—the amount of Weidenbaum and CLX's profits from their violations.  Weidenbaum and CLX shall be jointly and severally liable for the penalty.

### c.  Elliott and SEI

The undisputed record shows that Elliott and SEI sold over 4 billion shares for profits of over $6.2 million.  Thus there is no dispute that their conduct, too, was "egregious" in any reasonable sense of the term and indisputably "recurrent" rather than "isolated."  *Haligiannis*, 470 F. Supp. 2d at 386.  Moreover, Elliott acknowledges that, at the beginning of a three year selling spree and just after the SEC filed suit against Universal Express alleging that it had sold unregistered shares, he sent a fax referring to "the magnitude of the allegations USXP faces."  The fax strongly suggests that Elliott was aware that Universal Express shares were not properly registered.

Accordingly, there is no need for an evidentiary hearing as to scienter.  Elliott and SEI shall be enjoined from violating Section 5, shall be jointly and severally liable to disgorge $6,288,367.93 as well as $1,419,406.98 of prejudgment interest, shall be jointly and severally liable for a civil penalty of $6,288,367.93, and subject to a penny stock bar.

**CONCLUSION**

For the foregoing reasons, the SEC's motion **[71]** for summary judgment is GRANTED in part and DENIED in part as set forth in the following paragraphs. The SEC's motion **[95]** for entry of an order an order permanently enjoining Weidenbaum and CLX from violating Section 5 and finding them liable for disgorgement, prejudgment interest, and civil penalties is GRANTED.

With respect to Xirinachs and Emerald, the SEC's motion for summary judgment is granted as to liability. The SEC's motion for summary judgment as to disgorgement and prejudgment interest is granted in part to the extent that the SEC has reasonably estimated Xirinachs's and Emerald's profits from trades in unregistered Universal Express shares. The SEC's motion as to Xirinachs and Emerald is denied in all other respects. The SEC, Xirinachs, and Emerald shall jointly submit within 7 (seven) days a proposed date for an evidentiary hearing regarding scienter.

With respect to Weidenbaum and CLX, the SEC's motion for summary judgment is granted as to liability. Weidenbaum and CLX shall be jointly and severally liable for disgorgement in the amount of $2,411,397, prejudgment interest thereon in the amount of $486,344,40, and $2,411,397 in civil penalties. The SEC shall submit within 7 (seven) days of entry of this Order a proposed order providing for injunctive relief, disgorgement, and civil penalties.

With respect to Elliott and SEI, the SEC's motion for summary judgment is granted in its entirety. Elliott and SEI shall be enjoined from violating Section 5, shall be jointly and severally liable to disgorge $6,288,367.93 as well as $1,419,406.98 of prejudgment interest, shall be jointly and severally liable for a civil penalty of

$6,288,367.93, and shall be subject to a penny stock bar.  The SEC shall submit within 7 (seven) days of entry of this Order a proposed order providing for injunctive relief, disgorgement, and civil penalties.  The SEC shall also have leave to move for a default judgment against Elliott and SEI.


SO ORDERED.

Dated: New York, New York
       August **11**, 2011

                                              _____
                                              Richard J. Holwell
                                              United States District Judge