```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------- X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED JUN 1 2 2012

```
SECURITIES AND EXCHANGE COMMISSION,        :

                         Plaintiff,        :    09 Civ. 7594 (KBF)

              -v-                          :    OPINION AND ORDER

DOYLE SCOTT ELLIOTT,                       :
SCOTT ELLIOTT, INC.,
MICHAEL J. XIRINACHS,                      :
EMERALD ASSET ADVISORS LLC,
ROBERT L. WEIDENBAUM, and                  :
CLX & ASSOCIATES INC.,
                         Defendants.       :
----------------------------------------- X
```

KATHERINE B. FORREST, District Judge:

The purpose of the securities laws is to protect the investing public. The principal purpose of the Securities Act of 1933 is to ensure that the public has access to adequate disclosures regarding companies whose shares are offered for purchase and/or sale on a public stock exchange. Section 5 of the Securities Exchange Act of 1933, 15 U.S.C. § 77e, furthers this purpose by requiring companies to register shares with the Securities and Exchange Commission (the "SEC") before they are offered to the public. In certain circumstances, unregistered shares can be sold if they fall within an applicable exemption.

In an opinion dated August 11, 2011, Judge Holwell granted the SEC's motion for summary judgment as to liability against defendants Michael J. Xirinachs ("Xirinachs") and his company,

Emerald Asset Advisors LLC ("Emerald Asset Advisors"),
(collectively, "defendants") for violating Section 5.  SEC v.
Elliott, No. 09 Civ. 7594, 2011 WL 3586454, at *8-9 (S.D.N.Y.
Aug. 11, 2011).  In his Memorandum Opinion and Order, Judge
Holwell ruled that defendants bought and then sold billions of
unregistered shares in a company called Universal Express, Inc.
("Universal Express").  Id. at *14.  The Court assumes the
parties' familiarity with the facts and procedural history of
this case, contained in the August 11, 2011, summary judgment
decision.

    Defendants contend that, at the time of their actions, they
believed that the shares they were acquiring from Universal
Express were subject to a "bankruptcy exemption" under Section
5.  (Defs. Michael J. Xirinachs & Emerald Asset Advisors LLC's
Opposition to the SEC's Br. in Support of Remedies Against
Michael J. Xirinachs & Emerald Asset Advisors LLC at 2, Apr. 13,
2012, ECF No. 143 ("Defs.' Br.").)  It is undisputed that, in
fact, defendants were wrong and the shares were not subject to
such an exemption.  In his August 11, 2011, decision, Judge
Holwell ruled that there were material issues of fact regarding
the scienter with which defendants acted when they sold
unregistered shares not subject to an exemption.  Elliott, 2011
WL 3586454, at *15-16.  Judge Holwell explained that the Court's

determination as to whether to grant the SEC's request for a permanent injunction, penny stock bar and civil penalties does, at least to some extent, turn on the degree of scienter defendants had when they violated Section 5.  Id.  Moreover, while not necessary to a determination regarding disgorgement and prejudgment interest, Judge Holwell pointed out that scienter may inform the Court's decision as to those requested remedies as well.  Id.

This matter was transferred to this Court on February 9, 2012.  (Notice of Case Reassignment, Feb. 9, 2012, ECF No. 117.) On March 7 and 8, 2012, this Court held an evidentiary hearing on the issue of defendants' scienter.  Scienter is evaluated here with respect to Xirinachs' state of mind because he is the sole owner and controller of Emerald Asset Advisors.

The parties submitted post-hearing memoranda and the matter was deemed fully briefed on April 27, 2012.  For the reasons set forth below, this Court finds that, based upon the credible evidence presented at trial, Xirinachs, at the very least, acted recklessly when he engaged — and caused Emerald Asset Advisors to engage — in hundreds of sales of billions of shares of unregistered securities.

3

I.   The Witnesses Called at the Hearing

At the evidentiary hearing, the SEC called Xirinachs as its first witness.  The Court found certain aspects of Xirinachs' testimony lacking credibility.  He testified to a course of conduct which, based on his intelligence and expertise, defied common sense if true — and many aspects of which simply rang untrue.  He also periodically contradicted himself when a previous answer was revealed to be troublesome.  In short, while there is no doubt that Xirinachs earnestly wants to avoid the imposition of the penalties sought by the SEC, the Court found that his demeanor and testimony bolster and confirm that his sale of unregistered shares was committed with scienter.

The SEC called Timothy Dunn, an SEC staff accountant out of its Denver office who conducts examinations of broker-dealers and transfer agents.  Dunn testified as to what information was more than likely covered during the Series 7 exam taken by Xirinachs in 1987.  At the hearing, there was a great deal of back and forth regarding whether the study materials that Dunn had apparently kept on a shelf for several decades were the same as those that Xirinachs had used in connection with studying for his Series 7 exam.  The preponderance of the evidence did demonstrate that (1) Xirinachs took the Series 7 exam in October

4

1987 and (2) that exam would have included information regarding registration of shares and issues regarding unregistered shares.

The SEC then called Gary Gibbons, a Principal, Senior Analyst and Portfolio Manager with the Coleridge Group, a registered investment advisory firm.  The SEC offered Gibbons as an expert on industry customs and practices for investment advisers.  The Court found that Gibbons had substantial expertise in the area of investment advisory practices and found his testimony credible and useful with regard to whether Xirinachs acted in conformity with industry practice.  According to Gibbons, it was not reasonable for Xirinachs to have relied upon the representations of the General Counsel and CEO of Universal Express that the shares Xirinachs received at a substantial discount, and later sold, fell under a bankruptcy exemption that made them freely tradable.  Gibbons testified that Xirinachs should have sought additional information regarding the provenance of the shares.  In his experience, which the Court accepts as relevant to the issues in this case, it is the custom and practice in the industry to determine the provenance of shares when buying and selling them under circumstances like those surrounding the shares here.

Gibbons testified that the presence or absence of a "restricted legend" is not dispositive as to whether shares may

be traded.  He stated: "[I]f there's no evidence that the shares are registered, that becomes a problem for an investment manager or investment adviser.  If there's no evidence, you have to go a lot further to find out about the provenance of the shares." (Hr'g Tr. at 304:11-15.)  When a client would bring him a certificate without a legend, Gibbons testified that he would have followed the industry custom and practice of asking certain questions, including: How were the shares acquired and is there ancillary information corroborating those facts to ensure that they are registered?  If he was told that shares were acquired pursuant to a private placement or private sale, he would ask additional questions because "there's lots of ways [that] companies [] distribute shares and have them not tradable in the market, not [as] registered shares."  (Hr'g Tr. at 306:11-13.) According to Gibbons, if an investment adviser is told that shares are subject to a bankruptcy exemption, he should conduct an investigation to ensure that is the case and hire a lawyer to assist the investigation.  Gibbons also testified that it was not reasonable for Xirinachs to have relied upon any due diligence conducted by the broker-dealer or the transfer agent.

Determining provenance was particularly important here in light of various "red flags" associated with the shares.  Among

6

the red flags was the fact that Xirinachs purchased the shares at a variety of steep discounts.

The SEC also proffered Richard M. Leisner, Esq., a stockholder in the law firm Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis Professional Association, as an expert in securities laws.  The purpose of his testimony appeared to be aimed at establishing that the Universal Express shares were unregistered and not subject to a bankruptcy exemption.  The Court did not find Leisner's testimony to be helpful on the central issue for determination: whether Xirinachs acted reasonably or recklessly.

Defendants called Raymond L. Aronson as a proposed expert in the customs and practices of the securities industry.  Since 2004, Aronson has been a Senior Managing Director of Sutter Securities Group, Ltd., an investment banking firm that provides services in the areas of securities trading, financial advisory services, mergers and acquisitions, fairness opinions, business valuation and bankruptcy.  The vast bulk of Aronson's career (1975-2004) was spent as senior counsel to the Legal and Compliance Department for Bear Stearns Securities Corp. ("Bear Stearns").  During his tenure at Bear Stearns, Aronson advised on, *inter alia*, registration requirements and exemptions.

At the hearing, the Court asked Aronson whether he had particular knowledge of investment advisers who work with penny stocks.  He responded: "Some.  We didn't like them, and when we found brokerage firms that dealt extensively in penny stocks, which are expensive to process with a clearing firm, we would take steps to raise their rates and do other things to get them to leave, but, of course, you couldn't throw them out."  (Hr'g Tr. at 419:19.)  The SEC asked whether "Bear Stearns engage[d] in penny stocks, the offer and sale of penny stocks"; Aronson acknowledged that it did not.  (Hr'g Tr. at 431:14.)

Aronson also testified that he was a member of a committee that prepared questions for the Series 7 exam.  He stated that he "believe[s] [registered representatives] needed to know when they got restricted securities to pass them on to a party that could handle them."  (Hr'g Tr. at 423:22-23.)  When asked who that party was, Aronson responded that it was someone in a compliance or legal department.  Aronson was then asked: "If a registered representative were to acquire certificates in which the client says I purchased these directly from the issuer in a private placement, and I would like to sell them within 30 days, what exemption would that qualify for?"  (Hr'g Tr. at 424:14-17.)  He responded that he "[didn't] know all of the possible

8

ways it might be sold, but it ought to be passed upstairs to legal and compliance." (Hr'g Tr. at 424:22-24.)

The Court then asked: "Mr. Aronson, in your view, if you had been an investment adviser and you received shares under a bankruptcy exemption, what would you have done?  Would have you [sic] passed them upstairs to get them checked out by others to make sure they met all the requirements and do due diligence in some way, or nothing at all?  What is reasonable?" (Hr'g Tr. at 424:25-425:5.)  He responded: "I would pass them along at Bear to someone in the underwriting area to make determinations, or somebody in the bankruptcy area.  I'm not a bankruptcy expert." (Hr'g Tr. at 425:6-8.)

The Court then asked again: "In your view, would it be reasonable, if you were an investment adviser and received shares that you were told were subject to a bankruptcy exemption, to do no due diligence and not to pass them along to anybody?" (Hr'g Tr. at 425:11-15.)  Aronson responded: "As a lawyer, I certainly wouldn't do that.  As a person trained the way I am, I would not do that.  For a salesman at a small firm, I can't predict what they would do." (Hr'g Tr. at 425:16-19.)  The Court pressed: "So you don't know one way or the other whether that would be reasonable or not for a person at a small firm?" (Hr'g Tr. at 425:20-22.)  Aronson stated: "It would not

be unexpected.  Whether it's reasonable is a different issue."
(Hr'g Tr. at 425:23-24.)

To the extent that Aronson's testimony is helpful at all
(its utility being limited by the narrowness of his experience),
it confirms the SEC's position that a reasonable investment
adviser receiving shares said to be issued under a bankruptcy
exemption would seek to confirm the status of the shares.

II.  Facts Relevant to the Court's Determination

The evidence at the hearing demonstrated by a preponderance
of the evidence the following:

1.   Xirinachs is the founder and sole member of Emerald
Asset Advisors.  During the period of time that defendants were
engaged in transactions relating to the shares of Universal
Express, they used Basic Investors, Inc. ("Basic") as their
brokerage firm.  Xirinachs started working in the securities
industry at a brokerage firm in 1987, shortly after he took and
passed his Series 7 securities exam.  He has substantial
expertise in the securities industry.

2.   North Atlantic Resources Ltd. ("North Atlantic") is an
investment company incorporated under the laws of St. Vincent
and the Grenadines.  Thomas G. Phillips is the principal of
North Atlantic.  North Atlantic opened a trading account with

Basic in September 2006 — and listed Xirinachs as an investment adviser with trading authority.

3.     Over a period of 18 months, Xirinachs acquired and then sold over 15 billion unregistered shares of Universal Express in over 900 separate transactions.

4.     Xirinachs acquired these shares directly from Universal Express and at substantial discounts to market price. Altogether, he paid Universal Express more than $10 million and sold its shares into the market on both his own behalf and on behalf of North Atlantic for more than $17 million.

5.     Xirinachs testified that he knew that the Universal Express shares were not subject to a registration statement when he acquired them.

6.     Xirinachs asserts that when he made these sales he acted without scienter — he assumed that they were "freely tradable" shares issued under a bankruptcy exemption.  He knew that Universal Express had been in, and had exited, bankruptcy.

7.     Xirinachs asserts that he acted reasonably because he relied upon, *inter alia*: (1) statements made by the inside legal counsel for Universal Express who represented to him that the shares were issued under a bankruptcy exemption; (2) corporate resolutions that indicated that the shares were "free trading"; (3) statements made by the CEO and General Counsel of Universal

Express that the shares were freely tradable; and (4) the ability and competence of Basic, his brokerage firm, to conduct whatever due diligence was necessary to ensure that the shares were freely trading.

8.    Xirinachs made no separate attempt to confirm the existence of, or requirements relating to, the alleged bankruptcy exemption.  While he had hired lawyers in the past and worked with lawyers in connection with securities offerings for companies with which he was involved, he did not hire a lawyer in connection with his transactions with Universal Express.

9.    On forms that he provided to Basic regarding the shares, Xirinachs left blank a question that asked for information regarding whether shares were issued pursuant to an exemption.

10.    Xirinachs and Emerald Asset Advisors have and continue regularly to trade in penny stocks.  Since the SEC brought its case in this matter, Xirinachs has put in place several measures he believes will prevent a recurrence of what he claims was the inadvertent sale of unregistered securities.  He has hired lawyers to review transactions, works with several brokerage houses and no longer acquires shares directly from issuers.

11.   Prior to the transactions in which he engaged with Universal Express, he had never before acquired more than five billion shares of a particular company, and he has not since.

12.   Xirinachs has decades of training and experience in the securities industry.  He took and passed the Series 7 exam that required him to learn information regarding the registration of securities.  Xirinachs would have been required to learn the rules regarding registration of securities and issues related to limitations on the sale of unregistered securities.

13.   Prior to engaging in the transactions relating to Universal Express shares, he had been involved in the registration of shares with respect to other companies; he had also received unregistered shares from other companies and understood that there were limitations on his ability to trade those shares.  For instance, in October 1996, Xirinachs was one of the founders and directors of Rockwell Medical Technologies, Inc.  He received a substantial amount of "founder's stock" that was subject to an exemption, and additional shares pursuant to an option plan.  In 1997, Xirinachs signed a registration statement on behalf of Rockwell.  That statement was prepared by Rockwell in consultation with legal counsel.  The registration statement specifically described Xirinachs' shares as

13

restricted.  In 2006, Xirinachs entered into another transaction with Rockwell in which Emerald Asset Advisors purchased restricted securities from Rockwell.  This transaction required Rockwell to file a registration statement before Emerald Asset Advisors could sell its shares.

14.  In 2003, Xirinachs had an interest in a company called Telkonet Inc. ("Telkonet").  That year, Telkonet filed an amendment to its registration statement to register shares acquired by its shareholders through convertible debentures or senior notes.  Xirinachs was one of those shareholders.  Also in 2003, Xirinachs purchased shares from the principal shareholder of Bankengine Technologies, Inc. and became its CEO.  He then signed a share exchange agreement that disclosed that his shares could not be resold until a registration statement was declared effective.

15.  In 2004, Xirinachs reviewed a registration statement of a company called Netwolves Corporation.

16.  In 2007, both Emerald Asset Advisors and North Atlantic purchased restricted shares in a company called Eternal Image.  Xirinachs received the shares in July 2007 and began to sell them a month later.  After these sales had occurred, Xirinachs saw a registration statement from Eternal Image that

registered certain shares purchased by North Atlantic for resale.

17.   On a number of occasions in which far smaller amounts were at issue than in this matter, Xirinachs had hired lawyers (or the companies with which he was associated hired lawyers) to assist with ensuring that the process of buying and selling securities was done in accordance with the law.

18.   In connection with his investments in companies, Xirinachs typically reads their public filings.  In connection with Universal Express, he read some public filings but could not recall which filings he read, their financial position and the number of shares they had outstanding at the time.  He also testified that he probably did not read the "litigation" section in Universal Express's public filings that disclosed that a preliminary injunction had been issued against Universal Express for engaging in sales of unregistered securities.

19.   As a matter of custom and practice, issuers, brokers and sellers will not effect a securities transaction under the private placement rule, Rule 144A, until they have complete information about the transaction and the shares.

20.   Industry custom and practice is for investment managers to determine the provenance of any shares.  A prudent

investment manager will not and should not rely on the self-serving statements of issuers or their counsel.

III. Applicable Legal Standards

A district court, having already found that defendants violated Section 5, has broad equitable powers to fashion appropriate remedies. SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1474 (2d Cir. 1996). Among these remedies are permanent injunctive relief, a penny stock bar, civil penalties, disgorgement and prejudgment interest. See id. at 1474-78. See also SEC v. Lorin, 76 F.3d 458, 461-62 (2d. Cir. 1996).

A. Scienter

"Scienter is not an element of a section 5 violation." SEC v. Czarnik, No. 10 Civ. 745, 2010 WL 4860678, at *11 (S.D.N.Y., Nov. 29, 2010). Scienter is, however, relevant to the nature and extent of civil remedies that may be imposed for such a violation. See SEC v. Universal Major Ind. Corp., 546 F.2d 1044, 1048 (2d Cir. 1976). Here, the SEC has requested a permanent injunction, penny stock bar, civil penalties, disgorgement and prejudgment interest.

"The key point of contention between the parties is [the] scienter" with which defendants acted when they engaged in hundreds of sales of billions of unregistered securities. SEC v. Elliot, 2011 WL 3586454, at *14. As a matter of law,

16

Xirinachs' state of mind is attributed to Emerald Asset

Advisors, an entity that he owned and controlled.  See Suez

Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87,

100-01 (2d Cir. 2001)(scienter of a corporate defendant's agent

is attributable to the corporation); SEC v. Manor Nursing Ctrs.,

Inc., 458 F.2d 1082, 1089 n.3 (2d Cir. 1972) (scienter of one

who "controlled" two corporations could be imputed to those

entities).

Knowledge or reckless conduct is "sufficient to establish

scienter."  Universal Major, 546 F.2d at 1047.  Reckless conduct

has been defined as "conduct which is highly unreasonable and

which represents an extreme departure from the standards of

ordinary care to the extent that the danger was either known to

the defendant or so obvious that the defendant had to have been

aware of it."  Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir.

2001)

In SEC Release No. 6721, the SEC provides guidance

regarding the expected standards of conduct for registered

broker-dealers when dealing in unregistered securities:

> The amount of inquiry called for necessarily varies
> with the circumstances of particular cases.  A dealer
> who is offered a modest amount of a widely traded
> security by a responsible customer, whose lack of
> relationship to the issuer is well known to him, may
> ordinarily proceed with considerable confidence.  On
> the other hand, when a dealer is offered a substantial
> block of a little-known security, either by persons

> who appear reluctant to disclose exactly where the
> securities came from, or where the surrounding
> circumstances raise a question as to whether or not
> the ostensible seller may be merely intermediaries for
> controlling persons or statutory underwriters, then
> searching inquiry is called for.
> The problem becomes particularly acute where
> substantial amounts of a previously little known
> security appear in the trading markets within a fairly
> short period of time and without the benefit of
> registration under the Securities Act of 1933 . . . .\

Distribution by Broker-Dealers of Unregistered Securities,

Securities Act Release No. 4445, Exchange Act Release No. 6721,

27 Fed. Reg. 1415 (Feb. 2, 1962).

In another release, the SEC reiterates its guidance that

broker-dealers should conduct such inquiries as are appropriate

under the circumstances when they are dealing in securities of

little known issuers. See Laser Arms Corp., Exchange Act

Release No. 28878, 48 SEC Docket 305 (Feb. 14, 1991). The SEC

explained:

> A dealer who offers to sell, or is asked to sell a
> substantial amount of securities *must take whatever steps
> are necessary* to be sure that this is a transaction not
> involving an issuer, person, in a control relationship with
> an issuer or an underwriter. For this purpose, *it is not
> sufficient for him merely to accept* "self-serving
> statements of his sellers and their counsel *without
> reasonably exploring the possibility of contrary facts* . .
> . .

Id. (quoting Distribution by Broker-Dealers of Unregistered

Sec., Securities Act Release No. 4445). The SEC stressed that

"[t]he amount of inquiry varies with the circumstances of

18

particular cases." Id.  See also Kane v. SEC, 842 F.2d 194, 199 (8th Cir. 1988).

Here, there is overwhelming evidence that Xirinachs acted at least recklessly in selling billions of unregistered Universal Express shares.  He had the experience and expertise to understand that shares need to be registered before they can be sold on the open market.  He also generally reviewed information regarding companies in which he was investing.  If he had done that here to even a minimal degree he would have been made aware of the following red flags: this company had a history of sales of unregistered securities; the timing of Universal Express's bankruptcy made it unlikely to impossible for a bankruptcy exemption to apply to most (if not all) of the shares; Universal Express did not even have the number of authorized shares he was acquiring at the time he began to purchase shares from them; and, finally, the documentation that he received from Universal Express was not consistent with a bankruptcy exemption.

Moreover, the fact that Xirinachs left blank portions of the brokerage forms requiring him to state whether the Universal Express shares were issued pursuant to an exemption or restriction and the fact that he had never before, and has never

19

since, engaged in the acquisition and sale of so many billions of shares, support a finding that Xirinachs acted with scienter.

It is incredible that Xirinachs did not do minimal research on a company before investing $10 million in it — and such research would have revealed to him that there were serious problems with the transactions in which he was engaged. Plainly, Xirinachs did not act within the standards of the custom and practice in the industry when he engaged in these transactions with Universal Express; had he, he would never have engaged in the first sale of the unregistered shares, let alone the more than 900 that followed.

There were a number of red flags that should have tipped off Xirinachs to problems with the Universal Express stock. That he ignored them, given the profits he was making quickly and consistently, evidences at least willful blindness.

B. Permanent Injunctive Relief

The SEC has requested a permanent injunction that, as the Court remarked at the hearing, merely requires that defendants never again engage in violations of Section 5. This is the same scope of injunctive relief the SEC has sought and obtained against the other original defendants in this action, and the requested relief is not without precedent. See e.g., Manor Nursing, 458 F.2d at 1100 ("[The district court] has broad

discretion to enjoin future violations of law where past
violations have been shown."). It is somewhat odd to have an
injunction that merely prohibits that which the law already
prohibits — nonetheless, there are various collateral issues
that arise with these types of injunctions (e.g., reporting
requirements). The standard for obtaining such a permanent
injunction does not depend on its scope.

In determining whether the SEC has met its burden for the
issuance of permanent injunctive relief, this Court considers
(1) "the likelihood of future violations"; (2) "the degree of
scienter involved"; (3) "the isolated or repeated nature of the
violations"; and (4) "the sincerity of the defendant's
assurances against future violations". Universal Major, 546
F.2d at 1048.

Permanent injunctive relief should only issue when there is
a likelihood that, unless a defendant is enjoined, violations
will continue. CFTC v. Am. Bd. of Trade, 803 F.2d 1242, 1250-51
(2d Cir. 1986). See also SEC v. Haligiannis, 470 F. Supp. 2d
373, 383 (S.D.N.Y. 2007). There is no requirement for
irreparable harm. Haligiannis, 470 F. Supp. 2d at 383 n.9.
Such an injunction is particularly within the court's discretion
where a violation was based on systematic wrongdoing rather than
an isolated occurrence. First Jersey, 101 F.3d at 1477 (quoting

United States v. Carson, 52 F.3d 1173, 1184 (2d Cir. 1995)).

Further, the Court's view of continued protestations of

innocence may be relevant to whether a defendant is likely to

repeat prior conduct.  Id.; Lorin, 76 F.3d at 461.

Here, all factors strongly favor issuance of permanent

injunctive relief.

In terms of the level of scienter, as this Court has set

forth above, defendants at the very least acted both recklessly

and with willful blindness.

The repeated nature of the violation is also apparent:

there were over 900 sales of what amounted to billions of shares

of unregistered stock; even quick due diligence would have

revealed that these shares were not subject to any exemption and

that the statement that they were was a clear lie from the

issuers.  The multiplicity and egregiousness of the offense also

fulfills the third factor: that this was far from an isolated

occurrence — this pattern was established, followed and

successful.

Next, this Court looks at the sincerity of the defendants'

assurances against future violations.  While Xirinachs has

testified to certain processes in place that should prevent

similar violations in the future, the Court also believes that

defendants were able to act with willful blindness when it was

in their interest to do so.  The best processes in the world will only work if they are used — minimal adherence to industry standards would have prevented the violations before this Court.

Having found that defendants were reckless and willfully blind (at minimum), that the violations were repeated and numerous and that the most basic standards were not adhered to, the Court concludes that the likelihood of future violations is high.  By acting outside of the customs and practices of the industry, ignoring a host of red flags and "believing" a story about a bankruptcy exemption that could not possibly have existed, this Court must find that defendants are likely to violation Section 5 again.  Thus, weighing all of the factors, the Court finds that a permanent injunction is warranted.

C. Penny Stock Bar

The Securities Act has a specific provision that authorizes a court to impose a complete penny stock bar on a person found to have engaged in, *inter alia*, sales of unregistered securities.  15 U.S.C. § 78u.  The court may impose such a bar "conditionally or unconditionally, and permanently or for such period of time as the court shall determine."  Id.

In determining whether to impose a bar, courts consider "(1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the

defendant's role or position when he engaged in the conduct; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." SEC v. Jadidian, No. 08 Civ. 8079, 2011 WL 1327245, at *7 (S.D.N.Y. Mar. 31, 2011) (quoting SEC v. Patel, 61 F.3d 137, 141 (2d Cir. 1995)).

Many of the factors for the imposition of a penny stock bar are similar to those for a permanent injunction and the Court will not repeat its reasoning here: the violation was egregious, defendants acted with a high degree of scienter and the violations occurred over 900 times. The Court adds that Xirinachs engaged in these transactions on his own behalf, as the founder and owner of Emerald Asset Advisors, and he recommended the shares to North Atlantic. Defendants made substantial profits from the transactions. As stated above, given the variance from custom and practice and the number of red flags that should have stopped defendants from proceeding, the Court does not believe that, given sufficient financial motivation, defendants will not find a way to avoid using any new processes to prevent future violations.

Accordingly, a penny stock bar for a significant period of time is appropriate here to recognize the seriousness of the offense and act as a deterrent against future violations. This

24

Court imposes a penny stock bar to run for a period of three years from the date of this Order.  Thereafter, defendants are required to permanently maintain the "new due diligence procedures" in connection with trading any penny stocks, which they inform the Court were implemented following the filing of this action (Defs.' Br. at 19-20).  This three-year bar covers the sale or transfer by defendants of any penny stocks, whether for their own account or the account of others; it does not prevent the acquisition of penny stocks.

### D. Civil Penalties

There are three tiers of possible civil penalties that a court has the discretion to impose for violations of Section 5: a First Tier penalty for each violation shall not exceed the greater of $6,500 for a natural person or $65,000 for an entity, or the gross pecuniary gain as a result of the violation.  15 U.S.C. § 77t(d)(2)(A); 17 C.F.R. § 201.1003 (2005) (adjusting for inflation penalties for violations occurring after February 14, 2005).  That amount increases under Second and Third Tier penalties to, respectively, $65,000 and $130,000 per violation for a natural person, and $325,000 and $650,000 for an entity or the gross amount of pecuniary gain.

Second Tier penalties are only appropriate if the violation involved "fraud, deceit, manipulation, or deliberate or reckless

disregard of a regulatory requirement." 15 U.S.C. §

77t(d)(2)(B); 17 C.F.R. § 201.1003. Third Tier penalties add a

requirement that the violations directly or indirectly resulted

in substantial losses or created significant risk of losses to

other persons. 15 U.S.C. § 77t(d)(2)(C)(II).

In determining whether to impose a civil penalty, courts

review: "(1) the egregiousness of the defendant's conduct; (2)

the degree of the defendant's scienter; (3) whether the

defendant's conduct created substantial losses or the risk of

substantial losses to other persons; (4) whether the defendant's

conduct was isolated or recurrent; and (5) whether the penalty

should be reduced due to the defendant's demonstrated current

and future financial condition." Haligiannis, 470 F. Supp. 2d at

386. See also SEC v. Credit Bancorp, Ltd., 738 F. Supp. 3d 376,

391 (S.D.N.Y. 2010).

For the reasons already stated, this Court finds an award

of civil penalties appropriate. In addition to the Court's

statements regarding the egregiousness of the conduct, the

degree of scienter and the recurrent nature of the violations,

the Court adds that defendants' conduct did create the risk of

substantial loss to others. The very purpose of requiring

securities be registered, or to fall under an authorized

exemption, prior to sale to the investing public is to protect

the public.  Here, defendants put billions of shares of
unregistered securities not subject to any exemption into the
open market.  There is no record before the Court regarding
whether the public in fact experienced substantial losses, but
there was certainly a risk of that.  Finally, defendants have
not attempted to show that they cannot pay a financial penalty —
just that no penalty or only a very small one should be imposed.

While this Court finds that defendants' actions meet the
standard for imposing Second or Third Tier penalties, given the
number of transactions and the amounts that could be assessed
per transaction, such an award would be unduly penalizing.
Accordingly, this Court awards First Tier damages in the amount
of $6,500 per transaction.  Because the record is not clear as
to the precise number of violations by defendants and Xirinachs
alone, the Court directs the SEC to proffer by June 25, 2012,
with citations to the record, the precise number of transactions
at issue.  (Compare SEC's Br. in Support of Remedies Against
Michael Xirinachs & Emerald Asset Advisors LLC at 12, Mar. 26,
2012, ECF No. 141 ("Pl.'s Br.") at 22-23 (stating that
defendants engaged in a total of 593 transactions and that
defendant Xirinachs engaged in 328 transactions in the North
Atlantic account) with Hr'g Tr. at 9:24 ("[T]here's 916 sales
transactions.").)

E. Disgorgement

Disgorgement is designed to deprive the Section 5 violator of his ill-gotten gains. See First Jersey, 101 F.3d at 1474; SEC v. Wang, 944 F.2d 80, 85 (2d Cir. 1991). As articulated by the Second Circuit, "[t]he effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable." Manor Nursing, 458 F.2d at 1104.

The SEC and defendants dispute the amount of proper disgorgement. Defendants have put forward arguments and certain records that they assert demonstrate that defendant Xirinachs' profits were no more than $576,627.62 (twenty percent of Emerald Asset Advisors' profits, or $2,883,138.10). (Defs.' Br. at 22; Exs. III-1-29.) They claim that $2,306,510.48 represents payments defendants made to individuals and entities of their share in the profits attributable to the sale of the unregistered sales of Universal Express stock (eighty percent of Emerald Asset Advisors' profits). (Defs.' Br. at 22; Exs. III-1-29.) In addition, defendants claim they paid North Atlantic $1,409,500 in 2009 for its share of profits attributable to sales of unregistered Universal Express shares. (Pl.'s Br. at 18.)

First, this information conflicts with evidence in the record indicating that Xirinachs was the sole owner and

shareholder of Emerald Asset Advisors.  (Ex. 26.)  Second, there is no evidence in the record that North Atlantic had any right or reason to participate in Emerald Asset Advisors' own sales of Universal Express shares.  It is true that North Atlantic had entered into a partnership agreement with Emerald Asset Advisors on March 21, 2007.  (Ex. 38.)  Still, there are no records reflecting the alleged shares sold as part of this arrangement or any split in profits.  The lack of paper trail makes it impossible for this Court to credit that the profits Emerald Asset Advisors so clearly received were in fact transferred to North Atlantic.

The SEC argues that these records are too ambiguous to demonstrate the point for which they are offered — and that defendants should be required to disgorge the full, provable amount of profits attributable to their sales of unregistered securities, even if some of these profits may have later been transferred to others.  (See Pl.'s Br. at 17.)  The SEC requests disgorgement on a joint and several basis against defendants in the amount of $3,052,752 in profits attributable to sales of Universal Express stock, as well as $345,462 in disgorgement from Xirinachs for amounts paid to him by North Atlantic in connection with sales of Universal Express shares that he made on its behalf.  (Pl.'s Br. at 17.)

This Court has broad discretion not only to impose disgorgement but also to calculate the amount.  First Jersey, 101 F.3d at 1474-75; Lorin, 76 F.3d at 462.  Any risk of uncertainty as to the proper amount of disgorgement should fall on the wrongdoer "whose illegal conduct created that uncertainty."  First Jersey, 101 F.3d at 1475 (quoting Patel, 61 F.3d at 140).

The Court orders joint and several disgorgement against defendants of $3,052,752 in profits attributable to sales of Universal Express shares, as well as disgorgement against Xirinachs of $345,462 in amounts paid to him by North Atlantic in connection with sales of Universal Express stock he made on its behalf.

F. Prejudgment Interest

In a SEC injunctive action, whether to impose prejudgment interest, and the rate of any such interest, is left to the discretion of this Court.  First Jersey, 101 F.3d at 1476; Credit Bancorp, 738 F.Supp.3d at 390.  In deciding whether to award prejudgment interest, this Court considers (1) "the need to fully compensate the wronged party for actual damages suffered", (2) "considerations of fairness and the relative equities of the award", (3) "the remedial purpose of the statute involved" and/or (4) "such other factors as are deemed relevant

by the court." First Jersey, 101 F.3d at 1476. Along with
disgorgement, prejudgment interest ensures that the "defendant
does not profit" from his ill-gotten gains, including the time
value of money. SEC v. World Info. Tech., Inc., 590 F. Supp. 2d
574, 578 (S.D.N.Y. 2008).

For the reasons stated above, the Court orders prejudgment
interest on the amounts to be disgorged.

Judge Holwell determined in the August 11, 2011, summary
judgment decision that the rate used by the Internal Revenue
Service for interest on underpaid taxes under 26 U.S.C. §
6621(a)(2) is the most appropriate rate with which to calculate
the amount of prejudgment interest here. SEC v. Elliot, 2011 WL
3586454, at *11. While defendants argue that prejudgment
interest should apply to a limited amount of funds (an argument
this Court rejected in the discussion on disgorgement), they do
not disagree with this rate or dispute the SEC's prejudgment
interest calculations. Accordingly, the Court orders defendants
to pay $730,621 in prejudgment interest and defendant Xirinachs
to pay $82,680.01 on the amounts to be disgorged listed above.
(See Pl.'s Br. at 17, Ex. 78 (Prejudgment Interest Report).)

IV. Conclusion

For the reasons set forth above, defendants are permanently
enjoined from violating Section 5 of the Securities Act of 1933,

31

15 U.S.C. § 77e; they are enjoined for a period of three years from engaging, participating or advising in any way in the sale of penny stocks; they shall pay a First Tier civil fine in the amount of $6,500 per transaction (a total amount to be determined after a proffer from the SEC as to the precise number of violations) and defendants shall jointly and severally disgorge $3,052,752 in profits attributable to sales of Universal Express stock plus $730,621 in prejudgment interest and defendant Xirinachs shall disgorge $345,462 in amounts paid to him by North Atlantic in connection with sales of Universal Express stock he made on its behalf plus $82,680.01 in prejudgment interest.

The SEC shall submit a proffer as to the number of transactions at issue, with citations to the record, not later than June 25, 2012.


So Ordered.

Dated: New York, New York
       June 12, 2012

_____
KATHERINE B. FORREST
United States District Judge